IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

LOCKARD AIRCRAFT SALES CO., INC.,

Plaintiff,

v.                                                              Case No. 23-cv-1004-JWB

DUMONT AIRCRAFT SALES, LLC,

Defendant.

## MEMORANDUM AND ORDER

This matter comes before the court on Defendant Dumont Aircraft Sales, LLC's motion for partial summary judgment.  (Doc. 154.)  The motion is fully briefed and ripe for decision. (Docs. 155, 157.)  For the reasons stated herein, the motion is GRANTED IN PART and DENIED IN PART.

## I.      BACKGROUND

The following statement of facts is taken from the parties' submissions and the stipulated facts set forth in the Pretrial Order (Doc. 147).   Factual disputes about immaterial matters are not relevant to the determination before the court.  Therefore, immaterial facts and factual averments that are not supported by record citations are omitted.

Plaintiff Lockard Aircraft Sales Co., Inc. is an Oklahoma corporation with its principal place of business in Tulsa, Oklahoma.   Plaintiff is involved in the aviation industry as an independent broker of aircraft sales.  Plaintiff is owned and operated by Dennis Lockard and his wife, Tammie Lockard.  Defendant Dumont Aircraft Sales, LLC ("DAS") is a Delaware limited liability company with its principal place of business in New Castle, Delaware.[1]  DAS is engaged

---

[1] At the time giving rise to this suit, DAS was wholly owned by Dumont Group, LLC ("Dumont Group"), which is a Delaware limited liability company with its principal place of business located in New Castle, Delaware.  (Doc. 154

in the business of buying and selling pre-owned aircraft.  Dan Piraino and Kevin Wargo were both

managers of DAS and residing in Delaware at the time of the events giving rise to this suit.  (Doc.

147 at 2-3.)

Prior to the contractual relationship at issue in this case, Dennis Lockard had sourced

aircraft for DAS.  (*Id*. at 3.)  On December 10, 2014, DAS offered Plaintiff the opportunity to work

for DAS on an exclusive basis.  (*Id*.)  Specifically, Dan Piraino emailed Dennis Lockard, asking:

"Any chance you want to join our team full time?"  (Doc. 81-3.)  Dennis Lockard responded:

"absolutely, I would love to discuss that with you."  (*Id*.)  Later that same day, Dennis Lockard

emailed Dan Piraino: "Would I need to relocate or work from Tulsa?" and asked for a "Brief job

description."  (Doc. 155-3 at 2.)  Dan Piraino responded: "Sell.  Buy.  Stay home."  (*Id*.)

On December 27, 2014, Dan Piraino emailed proposed commission agreement terms to

Dennis Lockard.  (*Id*.)  The email stated:

> How about this for a deal:
>
> - 120k base
> - once $360k in profit is generated from Lockard's sales annually, Lockard
>   receives 33.3% of Lockard's aircraft sales profit
> - paid as a 1099 contractor monthly
> - access to Jetnet
>
> We would expect all your deals to go through Dumont exclusively.
> How does this sound?

(Doc. 81-5 at 2.)

Dennis Lockard responded by thanking Dan Piraino for "the generous offer," and listing

some questions about the deal terms.  (Doc. 81-4 at 2.)  Dan Piraino answered the questions to

Dennis Lockard's satisfaction.  (Doc. 81-5 at 1-2.)  Dennis Lockard then sent a reply agreeing to

---

at 23-24, ¶¶4-4.)  Neither DAS nor Dumont Group have ever had an office in Oklahoma.  (*Id.* at 24, ¶ 6.)  DAS is
currently owned by Dumont Aviation Group, Inc.  (*Id.* at 23, ¶ 1.)

the terms of the commission agreement on behalf of his company, stating: "Totally on board.  Sign me up. Thank you."  (*Id*. at 1.)  Throughout the email exchange, Dan Piraino was in DAS's Delaware office, and Dennis Lockard was in Plaintiff's Oklahoma office.  (Doc. 154 at 24, ¶ 8; Doc. 155-9 at ¶ 6.)

The Commission Agreement was agreed to via email, and the parties did not execute any separate documents formalizing the terms of the agreement.  The parties have stipulated that the agreed upon terms of the Commission Agreement are as follows: (1) Plaintiff would serve as a 1099 independent contractor for DAS responsible for sourcing aircraft sales and purchases for DAS; (2) Plaintiff would receive annual base compensation of $120,000, paid at $10,000 per month; (3) once $360,000 in profit was generated from Plaintiff's annual sourced aircraft sales, Plaintiff would receive one-third (33 and 1/3%) of DAS's net profits of such sales over and above the $360,000 threshold.  (Doc. 147 at 3.)

During the agreement period with DAS, Plaintiff sourced at least 17, and as many as 19 aircraft for DAS.  (*Id*.)  DAS contends that only 17 aircraft are involved—11 sourced by Plaintiff to DAS for resale, and six involved "parts planes"[2] acquired by DAS.  (*Id*.)  But Plaintiff contends that it sourced 12 aircraft to DAS for resale, and an additional seven involved "parts planes" acquired by DAS.  (*Id*.)  Regardless of the precise number, every transaction was negotiated by Plaintiff in Tulsa, Oklahoma, and all monies for these transactions passed through escrow companies in Oklahoma City, Oklahoma.  (*See* Doc. 155-6.)  But the entire inventory of aircraft involved in the dispute where either purchased, sold, located, or disassembled in Delaware.  (Doc. 154 at 24, ¶ 9.)

---

[2] "Parts planes" are aircraft purchased for the purpose of tear down into their component parts, certification of such parts as required by the FAA, and marketing and selling such parts.

DAS paid Plaintiff the agreed-upon $120,000 annual base in $10,000 monthly payments from January 1, 2015 to December 31, 2015.  (*Id.* at 4.)  DAS also paid commissions totaling $79,659 for 17 aircraft deals Plaintiff sourced for DAS.  In total, DAS paid Plaintiff a total of $199,659 for twelve months of work for DAS.  DAS's payments were sent by check or wire to Plaintiff in Oklahoma.  (*See* Doc. 81-2 at 181:13-182:7.)

Plaintiff challenged the amount of commissions paid and subsequently terminated the agreement.  On June 15, 2016, Plaintiff brought suit in Oklahoma state court (Case No. CJ-2016-02221) against DAS for breach of contract, and against DAS, Dan Piraino, and Kevin Wargo for fraud.  (Doc. 2-1.)  Plaintiff seeks actual and compensatory damages in the amount of $241,072.61 and punitive damages in an amount to be determined by the jury.  Defendants subsequently removed the case to the Northern District of Oklahoma on July 18, 2016 (Case No. 16-469).  (Docs. 2, 2-1.)

On April 28, 2022, the case was assigned to the undersigned in an effort to alleviate a backlog of cases in the Northern District of Oklahoma following the decision in *McGirt v. Oklahoma*, 140 S. Ct. 2452 (2020).  Following this assignment, the undersigned advised the parties that they could have a trial setting on a jury docket with other cases.  Alternatively, the court could provide a firm setting in the District of Kansas.  The parties subsequently filed a joint motion to change venue in accordance with 28 U.S.C. § 1404.  (Doc. 146.)  The motion was granted and the case was transferred to this District on January 10, 2023.  (Docs. 148, 150.)

During the pretrial conference, the court raised concerns about whether Plaintiff preserved its fraud claims in the proposed Pretrial Order, i.e., Plaintiff's proposed factual contentions did not

meet the Rule 9 standard of pleading fraud with particularity.[3]  The court also noted that the parties disagreed about what substantive law governed Plaintiff's claims, as that issue had not yet been decided by the court.  Accordingly, the court permitted Defendants the opportunity to file an additional motion for partial summary judgment by January 11, 2023 addressing: (1) Plaintiff's fraud claims, and (2) whether the substantive issues in this case are governed by Oklahoma or Delaware state law.  (Doc. 147 at 19.)

On January 9, 2023, the parties field a joint stipulation of dismissal, dismissing all fraud claims with prejudice.  (Doc. 149.)  Pursuant to the stipulation, Piraino and Wargo were dismissed from the case, but the parties agreed that the court shall retain jurisdiction over them for purposes of their testimony at trial.  (Doc. 149 at 1.)  On January 12, 2023, the court entered an order approving the stipulation of dismissal.  (Doc. 152.)  Accordingly, the only claim remaining in the case is a single claim for breach of contract against DAS.

DAS timely filed its motion for partial summary judgment on January 11, 2023.[4]  (Doc. 154.)  DAS argues that: (1) Delaware law is applicable to the substantive issues involved in this case; and (2) Plaintiff's punitive damages claim fails as a matter of law because it was only asserted as part of Plaintiff's fraud claims, which have since been dismissed with prejudice.  (Doc. 154 at 18-22.)  In response, Plaintiff argues that: (1) Oklahoma substantive law governs Plaintiff's claim; and (2) summary judgment is not appropriate because punitive damages do not constitute an independent cause of action.  (Doc. 155 at 14-18.)

---

[3] Based on Plaintiff's proposed factual contentions, the court determined that Plaintiff had only stated a fraud claim based upon a single aircraft transaction (the "Falcon 50-144").  Plaintiff failed to include any factual allegations regarding any of the other aircraft or "parts plane" transactions.

[4] The motion was erroneously filed in the Northern District of Oklahoma docket the day after the case had been formally transferred to this District.  *See Lockard Aircraft Sales Co., Inc. v. Dumont Aircraft Sales, LLC*, Case No. 16-469 (N.D. Okla. Jan. 11, 2023) (Doc. 150).  The court contacted the parties and informed them that it would consider the motion to have been timely filed on January 11, 2023, but instructed DAS to re-file the motion in the District of Kansas docket.

## II.    LEGAL STANDARD

Summary judgment is appropriate if "the record, including depositions, documents . . . affidavits or declarations, stipulations. . . admissions, interrogatory answers, or other materials" establishes that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56; *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).  The moving party bears the initial burden of establishing the absence of a genuine issue of fact.  *Celotex v. Catrett*, 477 U.S. 317, 323 (1986).  The burden then shifts to the nonmovant to demonstrate that genuine issues remain for trial.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986).  The inquiry turns on "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  *Liberty Lobby*, 477 U.S. at 251-52.  In applying this standard, courts must view the evidence and all reasonable inferences from it in the light most favorable to the nonmovant.  *Matsushita*, 475 U.S. at 587.

## III.   ANALYSIS

### A.    Oklahoma Substantive Law Governs

The court begins by addressing which law applies to the contract at issue.  A federal court sitting in diversity applies the choice of law rules of the forum state to determine what law governs the interpretation of the contract at issue.  *Hamric v. Wilderness Expeditions, Inc.*, 6 F.4th 1108, 1126 (10th Cir. 2021).  As the recipient of a diversity case transferred under the change of venue statute, 28 U.S.C. § 1404(a), the court must apply the choice of law rules that would have applied in the transferor court.  *Trierweiler v. Croxton & Trench Holding Corp.*, 90 F.3d 1523, 1535 (10th Cir. 1996).  Thus, for choice of law purposes, the "forum state" is the transferor state—in this case, Oklahoma.  *Id.*

6

Oklahoma's choice of law rules for contract actions are determined by statute: "A contract is to be interpreted according to the law and usage of the place where it is to be performed, or, if it does not indicate a place of performance, according to the law and usage of the place where it is made." Okla. Stat. tit. 15, § 162. The Oklahoma Supreme Court has announced a strong preference for applying the law of the place of performance. *See Panama Processes, S.A. v. Cities Serv. Co.*, 796 P.2d 276, 287 (Okla. 1990). "It is only when there is *no indication in the contract* where performance is to occur that the interpretation would apply the *lex loci contractus* rule." *Id.* (emphasis in original). Although the contract in *Panama Processes* did not contain an express designation of the location of performance, the Oklahoma Supreme Court found that the location as intended by the parties was apparent because of the contract terms—terms which called for the majority of the contractual duties to be carried out in Brazil even though some of the duties were to be carried out in New York. *See id.* at 287-88.

Under the rationale set forth in *Panama Processes*, "the parties' intent, gleaned from the contract as a whole, requires" that the court apply Oklahoma law. *Id.* at 288. The parties contracted for the primary purpose of obtaining Plaintiff's labor and services as a broker. It was understood and intended by the parties that Plaintiff would buy and sell aircraft on behalf of DAS from Tulsa, Oklahoma where Plaintiff is based. (*See* Doc. 155-3 at 2 (Dan Piraino telling Dennis Lockard that he would not need to relocate and could work from Tulsa: "Sell. Buy. Stay home.")) *See also Devery Implement Co. v. J.I. Case Co.*, 944 F.2d 724, 728 (10th Cir. 1991) (applying 15 O.S. § 162 and holding that the parties to a manufacturer-dealer agreement contracted for the primary purpose of selling tractors in dealer's "trade area" in Oklahoma, and not in North Dakota where the tractor manufacturer was headquartered, and thus Oklahoma was the place of performance). Additionally, the parties understood and intended for DAS's commission payments

to be sent to Plaintiff at its principal place of business in Oklahoma.  (*See* Doc. 81-2 at 181:13-182:7.)

Some performance under the contract had to occur in Delaware because Delaware was DAS's principal place of business and decisions concerning the Commission Agreement and aircraft purchases/sales would be made there.  But these decisions are considered insignificant when compared with performance that would occur in Oklahoma as Plaintiff was primarily responsible for sourcing aircraft sales and purchases for DAS.  *See Panama Processes*, 796 P.2d at 288 (holding that some decisions concerning the agreement would necessarily be made in New York where defendant's principal place of business was located, but these decisions were considered insignificant when compared with the performance which had to occur in Brazil).

DAS advocates for the application of the "most significant relationship" test from the Restatement (Second) of Conflict of Laws, which provides factors to determine which state has the most significant relationship to the parties and the transaction.  (*See* Doc. 154 at 18 (citing *Collins Radio Co. v. Bell*, 623 P.2d 1039, 1047 (Okla. Civ. App. 1980; *Ysbrand v. Daimler Chrysler Corp.*, 81 P.3d 618 (Okla. 2003.))  This line of Oklahoma cases applies a *narrow* exception to 15 O.S. § 162 and allows for the utilization of the "most significant relationship" test in actions that involve contracts for the sale of goods under Article II of the Uniform Commercial Code ("UCC").[5]  However, this test is not applicable to general contract disputes within the purview of the statute.  *See Harvell v. Goodyear Tire & Rubber Co.*, 164 P.3d 1028, 1033-34 (Okla. 2006) (holding that the general rule from 15 O.S. § 162 applies unless the contract falls into either the UCC exception or the exception for motor vehicle insurance contracts).

---

[5] This is referred to as the "UCC exception" to the general rule set forth in 15 O.S. § 162.  *See* Patrick L. Stein, *Choice of Law: Defining the Place of Performance for General Contract Disputes in Oklahoma*, 64 Okla. L. Rev. 17, 19 (2011).

And here, the Commission Agreement is not a contract for the sale of goods under Article II of the UCC.  While the aircraft *purchase and sell agreements* Plaintiff brokered for DAS may have been contracts for the sale of goods, the *Commission Agreement* itself was not.  Rather, the Commission Agreement was a contract for Plaintiff's labor and services.  *See, e.g.*, *id*. at 1034 n.25 ("When a transaction relates primarily to services, an incidental sale of merchandise does not make it a contract for the sale of goods governed by the [UCC]."); *Fairchild v. Swearingen*, 377 P.3d 1262, 1264-65 (Okla. Civ. App. 2013) (explaining that the UCC applies to "transactions in goods," and not to contracts for labor and services, and holding that contract for the replacement of a roof was not subject to the UCC even though it involved the sale of shingles because this was merely incidental to the main purpose of the contract); *IB Agric., Inc. v. Monty's Plant Food Co*., 2014 WL 4851774, *3 (W.D. Ky. 2014) ("Courts most often classify typical distributorship agreements as contracts for the sale of goods . . . [such as] a contract for the sale of goods [where] the distributor purchased and received products from the manufacturer and then resold those products directly to the customers.  But, where the distributor's role is more properly characterized as commissioned sales representative, the distributorship agreement is a services contract."); *ADA Sols., Inc. v. Meadors*, 98 F. Supp. 3d 240, 248, 254 (D. Mass. 2015), *reversed on other grounds*, 665 F. App'x 3 (1st Cir. 2016) (holding that contract between a sales agent and a tile manufacturer, under which the sales agent agreed to sell the manufacturer's tiles to a third party in return for a commission, was "itself [a contract] for services," even though "it relates to the sale of goods by [the manufacturer] to [the third party]," because the agent's "role is to negotiate the sale of goods, for which it is to be paid a commission").

Accordingly, the court finds that the Commission Agreement must be interpreted according to the law of Oklahoma, as this is the place where the majority of the contractual duties were to be

carried out.[6]  Okla. Stat. tit. 15, § 162.  Accordingly, the court need not "determine the law of the place where the contract was made," nor "adopt any other approach to determine the applicable law."  *Devery Implement Co.*, 944 F.2d at 728 (quoting *Panama Processes*, 796 P.2d at 287).

### B.   Punitive Damages

Next, DAS moves for summary judgment on Plaintiff's request for punitive damages.  DAS contends that this case only involves a simple contract dispute, for which punitive damages are not recoverable.  (Doc. 154 at 21.)  The court agrees.  Under Oklahoma law, punitive damages are not recoverable for a breach of contract claim.  *See* Okla. stat. tit. 23 § 9.1(A) ("In an action for the breach of an obligation *not arising from contract*, the jury, in addition to actual damages, may . . . award punitive damages" (emphasis added)); *see also Fees v. Am. Life Ins. Co. of Coloumbus*, 2020 WL 3039124, at *8 (N.D. Okla. 2020) (holding that under Oklahoma law, the "plaintiff cannot recover punitive damages for his breach of contract claim"); *Cimarex Energy Co. v. Calhoon*, 2012 WL 1371386, at *5 (W.D. Okla. 2012) ("Punitive damages are not recoverable for a breach of contract.").  Plaintiff concedes that it "sought punitive damages as to its Fraud claim only," and has "not at any time in this case sought punitive damages as to its Breach of Contract claim."  (Doc. 155 at 10.)  But Plaintiff's fraud claims have been dismissed with prejudice, and the only claim remaining is for breach of contract.  (Docs. 149, 152.)  Accordingly, the court finds that punitive damages are not recoverable as a matter of law.  *See Noll v. Apex Surgical, LLC*, 2010

---

[6] The court notes that there is still an undecided issue of whether the parties entered into a separate commission agreement for the sale of parts planes and "internally owned" aircraft.  (*See* Doc. 147 at 6 (Plaintiff contending that it is entitled to commissions for all aircraft transactions brokered under the original Commission Agreement); *id.* at 8 (DAS contending "[t]here was a subsequent agreement reached between DAS and Plaintiff for parts planes that Lockard sourced for DAS."))  The court declines to resolve this dispute as it is irrelevant to the issues raised in the present motion.  But for the sake of clarity, the court finds that any subsequent agreement(s) the parties made regarding commissions for Plaintiff's services will also be interpreted under the laws of Oklahoma for the same reasons stated above.

WL 2813430, at *8 (W.D. Okla. 2010) (granting summary judgment where "the record does not support recovery of punitive damages").

IV.     **CONCLUSION**

IT IS THEREFORE ORDERED that Defendant DAS's motion for partial summary judgment (Doc. 154) is GRANTED IN PART and DENIED IN PART.  The motion is granted with respect to Plaintiff's request for punitive damages.  The motion is denied with respect to the choice of law issue.  The Commission Agreement will be interpreted according to the laws of Oklahoma.

IT IS SO ORDERED.  Dated this 27th day of June, 2023.

*s/John W. Broomes*
JOHN W. BROOMES
UNITED STATES DISTRICT JUDGE